## BOARD OF COM'RS OF GRANT COUNTY et al. v. COMSTOCK.

No. 21314. Opinion Filed Dec. 20, 1932.

C. N. Ernest, Co. Atty., and Breeden & Breeden, for plaintiffs in error.

Sam P. Ridings and J. C. McClelland, for defendant in error.

KORNEGAY, J. This is a proceeding in error to review the action of the district court of Grant county in granting a mandatory injunction against the county commissioners, and also the township officers and a private citizen, based upon the proposition of disposing of the waters that accumulated along a county highway.

The plaintiffs in error have filed a brief and have made a statement of facts that appears to fairly cover the matters and things that are embraced in the record. This statement of facts is not controverted by the brief on the other side, except that it appears that the judge viewed the property before granting the mandatory injunction.

The petition was filed on the 15th of October, 1927. It complains of the embankment for the roadway, and also of the construction of the side ditches and of the culverts in the roadway, and of a drain that led from the roadway through the land of a neighbor, who had given permission to open the ditches across his land. In the statement of the evidence, the brief of the plaintiffs in error uses the following language:

"The evidence discloses the following facts, that are not controverted:

"The south half of section 18 and all of 19 is low flat land, difficult to drain. The A., T. & S. F. Railway runs east and west through section 19, on the half section line, and the roadbed is graded up so that the top of the grade is elevated above the land on each side of the right of way. There are two culverts through the railroad right of way, one is about 100 yards west of the northwest corner of southeast quarter of section 19 and the other is about 80 rods east of the northwest corner of said quarter. Plaintiff Comstock owns the said southeast quarter of section 19, and the southwest quarter of section 19 is spoken of as the Vincent quarter, and the northwest quarter of said section 19 is spoken of as the Higgins quarter and the northeast quarter of 19 is the Billman quarter. There is a lagoon or pond near the southeast corner of northwest quarter of section 19, in the pasture and the water falling on said northwest quarter of 19, except the southwest corner flows to the south and east towards the lagoon and from the lagoon onto the railroad right of way. The water falling on the northeast quarter of 19 flows to the south and west towards this lagoon. The water falling on the southwest quarter of section 18 flows to the south and east and the water falling on the southeast quarter of section 18 flows to the south and west. The section line running east and west between sections 18 and 19 is a county road and in 1915 and prior thereto this road was practically impassable in wet weather. In that year it was taken over as a county road, and has been graded up by the county until the crown of the road is higher than the farm land on either side of the road. The county has constructed and is maintaining a culvert under its roadbed at the lowest point in the land which happens to be near the half section corner at the northwest corner of the Billman land. From the culvert maintained by the county, running west to the southwest corner of section 18, there is a raise in the sur-

face of 3.3 feet. (Testimony of S. A. Hott, county engineer, page 104 of the record.) The raise in elevation in going east from the culvert to the southeast corner of section 18 (or northeast corner of section 19) is a little over a foot. (Testimony of S. A. Hott, county engineer, page 105 of record.) The fall from the culvert in the highway south along the west line of the Billman place to the right of way of the railroad, a half mile away is 4.49 feet. (Testimony of S. A. Hott, county engineer, page 105 of record. Also testimony of J. A. Lindsey, page 119 of record.)

"The railway profile shows, beginning at the west line of section 19 and going east, a slight raise for a distance of 700 feet and the water from this part of N. W. 19 flows through the culvert on this section line, continuing east from the 700 foot point, there is a three foot fall to culvert 111 B in right of way of railroad which is about 100 yards west of northwest corner of S. E. quarter of section 19, and continuing on east from culvert 111B to culvert 112-A there is a fall of two feet, and continuing on east from culvert 112A there is a raise of one and one-half foot to a point about 300 feet west of the northeast corner of southeast quarter of section 19 and then a slight fall to said northeast corner. This was the lay of land before the railroad was constructed. (See profile and testimony of S. A. Hott pages 110 and 111 of record and exhibit in record.)

"The testimony of J. W. Moore, engineer (pages 84 to 944 of record) shows that he measured the elevations from the top of the railway roadbed, going west from northeast corner of southeast quarter of 19 to the culvert 112A and the elevation of the roadbed varies practically the same as the surface varied in the profile.

"There was no evidence offered to contradict any of the foregoing facts and there was no conflict in the evidence. Plaintiff's contention was that the evidence showed that the elevation at the southwest corner of section 18 was two feet higher than the elevation at the southeast corner of said section 18, and notwithstanding the fact that the land near the center of said section 18 was one and one-half feet lower than at the southeast corner, a ditch should be cut deep enough to convey the water on east and not let it flow through the culvert, and on south to the railroad right of way.

"The board of commissioners contended that to cut the ditch deep enough to carry the water on east, will divert the water out of its natural course, and only transfer the grief and damage to another point on the highway.

"The court accepted the view of plaintiff's counsel and granted the injunction as appears from the record. There was no evidence that defendant Dirigo township or Billman had done or was doing anything in the premises, and in the absence of any testimony as to these defendants, we do not understand the theory upon which they were enjoined."

The counter statement in the other brief is as follows:

"The plaintiffs in error have set out an extensive statement of facts in their brief, and we will not here attempt to go over the same, or make any additional statement, but in the argument presented in this brief we will refer to the facts in connection with the questions then presented."

From this statement of facts it appears that the most relevant question is, whether or not a district court should by mandatory injunction direct the plan and operation of a road system. We do not think it necessary to decide the question here as to whether or not the plaintiff has any remedy at all for the damages that he alleges occurred to him by virtue of the accumulation of surface water made as a result of building roads. Suffice it to say that the modern conception of a road is somewhat different from what it was in the early settlement of the country. In the primitive stages, when the horse was the main means of transportation, both of goods and people, natural conditions very frequently sufficed, especially when expenses of creation and maintenance of roads was involved. With the advent, however, of the vehicle drawn by traction, a most radical change in operation arose, and the simple overseer of the days of horse power was in large measure supplemented by township supervisors, boards of county supervisors, culminating finally in a State Highway Commission, whose expenditures perhaps are greater than most any other combined body of the commonwealth.

With enlarged necessity there came enlarged power, based on discretion of the highest order, with reference to the laying out and the maintenance of highways suitable for modern conditions. Necessarily, as conditions changed, the rights of men vary. What was a fair rule of conduct in a primitive day, with reference to things natural that were placed here for the use of all men, would be outworn under a modern complex civilization. Lands in this part of Oklahoma were acquired subject to the right of the public to have roads along the section borders. Necessarily certain incidental inconveniences would flow from all methods of improvement. Sometimes, as a result of public improvement, there would be appreciable inevitable damage. It is not all of such that compensation can be claimed for, and neither can there be an equali-

zation of incidental burdens with mathematical exactitude.

As applied to the proof in this case, the country was not exactly level, but above the average so far as being level is concerned. In fact, it would take the accuracy of instruments, rather than the eye average to determine from observation of the country the way the water would flow. Experience, however, was brought into play in this case by proving actual accumulation in time of moderate as well as severe rainfall. The use of instruments, both those handled, apparently, by a county engineer and by a state engineer and by a railroad engineer, were taken advantage of. In the performance of duty, required of the county officers and the highway department, the road along the section line that was provided for in an early declaration of rights, was found to be boggy in places, with a result that the county commissioners, acting apparently under the guidance of skilled engineers, established a road grade and proceeded to grade and drain accordingly.

The result was that the water was collected that ordinarily had been diffused over a large area, and would gradually drift into the depressions that ran in the directions of the plaintiff's land. In order to make the roadbed reasonably secure, it was necessary to drain the road, just as the whole country has been brought to grade and drainage. The natural result of this change was, and is, that the water that formerly was a long time in getting to the water course gets there more rapidly now than before. At the same time the breaking of the prairie sod, and the change from a wild stage of native grass to a cultivated stage, have increased the runoff, so that the rains that fall as a result of natural causes run off more rapidly than before, and with less retention by the ground, according to what the agriculturists tell us. The effect of erosion at the same time, both gradual and sudden, has become far more marked.

As applied to the present case, the plaintiff is complaining of the water washing out his cultivated fields. Such, probably, is the condition of nearly every cultivated field that we have, unless the owner takes some precaution against the effects of erosion, some of which might be avoided, all of which cannot be. Perhaps a slight levee or a ditch cut by the plaintiff in error would have been less expensive than the cost of a lawsuit in this case. However, that should not interfere, if by balancing the equity of the parties the right of injunction should have been exercised in this case.

Our government is divided into three divisions, one being the executive department, another the judicial department, and the other the legislative department. The distribution of powers is a little more emphatic in our Constitution than in some. Article 4, sec. 1, of the Constitution is as follows:

"Section 1. Legislative, Executive and Judicial. The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

In rendering decisions about the performance of discretionary and purely ministerial duties, it is well to bear in mind this article. The Legislature, in the exercise of its power, has seen fit to enact a law on the subject of highway construction and management. It is in the Session Laws of 1923-24, c. 48, sec. 8, which appears in the Okla. Stats. 1931 as section 10090, and subdivisions (c) and (d) of that section are as follows:

"(c) The county highway shall be composed of all roads within any county, designated as such by the county commissioners less any part of any road or roads which will be taken over as a state highway by the State Highway Commission; provided, the county commissioners shall not designate more than twenty-five per cent. (25%) of their public highways as county highways. It shall be the duty of the county commissioners in each county to designate, construct, and maintain as county highways, those roads which best serve the most people in their travels from points in the county to trade centers of said county, and for this purpose the county commissioners are authorized to use any funds which are in their county highway fund, together with any money derived from any agreement entered into between the State Highway Commission and the federal government, any county or township, or any citizen or group of citizens who have made donations for that purpose. Provided, further, that the county commissioners of the various counties shall have exclusive jurisdiction over the designation, construction, and maintenance and repair of all of said county highways and bridges thereon. That the decision of the county commissioners in all matters pertaining to the county highways shall be final and that the empowering clause in this act gives to the county commissioners the same final jurisdiction to designate, construct, hard surface, maintain or repair county highways and bridges thereof, as is given the State Highway Commission on state highways. * * *

"(d) The township roads shall be composed of any road coming under the jurisdiction of the township government, and said township government shall construct and maintain such roads as now provided by law. It shall be the duty of the township government to use its money and labor on those roads which will best take the most people into the county or state highways."

Section 10143, O. S. 1931, under the head of "County Roads," provides for the location and for settlement of damages, while article 7, embracing sections 10165 to 10196, inclusive, provides in certain cases for the township roads and the duties of township officials with reference thereto.

As applied to the present situation, it appears to us that former decisions of this court have marked the way most clearly for our guidance, as well as the guidance of the lower court. Government by injunction has been so frequently misapplied that there is now, and has been for several years, almost a universal protest against it, even though unlawful violence might be prevented thereby. However, as applied to the present case, the injunction herein allowed, mandatory in character, it seems to us, was but an effort to control the discretion of another department of government, to whose authority and discretion the matter in question was specifically delegated by the Legislature.

While this court has ever claimed the right to give the remedy where a wrong had been inflicted, it has ever been wary of interfering with other departments of government. Following the general rule and the provisions of the Constitution, probably, the case of Moore v. Porterfield, 113 Okla. 234, 241 P. 346, was decided by this court with reference to the general proposition of interference by injunction. That dealt with a school matter, and the third section of the syllabus is as follows:

"Although, as a general rule, the discretionary powers of a public official will not be controlled by injunction, yet injunction may be issued in case of a gross abuse of such discretion or where it appears that such action is founded on fraud, corruption, improper motive, plain disregard of duty, gross abuse of power, or violation of the law."

However, in a later case, the question came up in a road matter, and the declarations of this court in Furgason v. Mitchell, 128 Okla. 232, 262 P. 500, appears to be an all sufficient reason why the mandatory injunction in this case should not have been granted, in the light of the testimony as to the surroundings and the balancing of equities, as between the various landowners in the community and an efficient road system. The syllabus to that case, which was decided on the 27th of December, 1927, is as follows:

"The proper officials are charged with the repair and maintenance of public highways, and, while acting in the scope of their authority, they are vested with a very broad discretion, with which courts will not interfere, by granting injunctive relief, except in cases of fraud, or where there is a manifest or gross injustice which would constitute an abuse of discretion."

The brief of the defendant in error goes to the proposition of the pleadings, and the necessity for saying everything in the pleadings that was wanted later when the evidence was developed, and the effect of the court's view of the surroundings, and a great many cases are cited bearing upon the points urged, and numerous extracts are made from the testimony. A review of that testimony in the light of the agreed facts is convincing to us that the highway officers were doing the best they could do under the circumstances, and that they very well balanced the inconveniences without any idea of oppressing anybody, and no element of fraud appears.

Under these conditions, we think that the equities were with the defendants, and that the court improperly interfered with their plans and methods for a highway by the mandatory injunction. The injunction, therefore, is dissolved and the judgment reversed, and directions are given to the lower court to enter judgment in favor of the defendants, all at the costs of the plaintiff below, the defendant in error here.

CLARK. V. C. J., and RILEY, HEFNER, SWINDALL. and ANDREWS, JJ., concur. McNEILL, J., concurs in conclusion. CULLISON, J., dissents. LESTER, C. J., absent.